YOUNG LIFE (formerly Young Life Campaign), Plaintiff-Appellant,

v.

DIVISION OF EMPLOYMENT AND TRAINING, Department of Labor and Employment, Defendants-Appellees.

No. 80SA316.

Supreme Court of Colorado, En Banc.

Aug. 16, 1982.

As Modified on Denial of Rehearing Sept. 7, 1982.

Holme, Roberts & Owen, James T. Flynn, Michael T. Browning, Colorado Springs, for plaintiff-appellant.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., David L. Lavinder, Asst. Atty. Gen., Human Resources Section, Denver, for defendants-appellees.

DUBOFSKY, Justice.

The plaintiff, Young Life, appeals the Denver District Court's affirmance of a decision by the Division of Employment and Training, Department of Labor and Employment (Division) that Young Life is not a "church" for purposes of section 8–70–103(10)(g)(I), C.R.S. 1973 (current version in 1981 Supp.) and therefore is not eligible for an exemption from Colorado's unemployment tax.[1] We affirm the district court's ruling.

Colorado's Employment Security Act (Act), sections 8–70–101, *et seq.*, C.R.S. 1973 and 1981 Supp., provides for a comprehensive system of unemployment insurance. It requires an employer to pay unemployment tax on wages paid to employees in certain areas of covered employment. The Colorado unemployment tax system is part of a cooperative federal-state scheme administered under the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301–3311 (1976 ed. and Supp.IV). FUTA imposes a federal excise tax on employers for unemployment compensation, but an employer is allowed a credit of up to ninety percent of the federal tax for contributions paid to a state fund which meets federal approval.[2] For this reason, the unemployment tax statutes of all fifty states closely track the relevant federal provisions.

Prior to 1970, FUTA excluded from the definition of covered employment for which unemployment tax had to be paid all "service performed in the employ of a religious, charitable, educational, or other organization" defined as tax-exempt for federal income tax purposes. Pub.L. 86–778, § 533, 74 Stat. 984 (1960). In 1970, Congress enacted a narrower unemployment tax exemption, limiting those organizations not required to pay the tax to churches, and religious organizations "operated, supervised, controlled or principally supported by a church or convention or association of churches." Employment Security Amendments of 1970, Pub.L. 91–373, § 104(b)(1), 84 Stat. 697, codified at 26 U.S.C. § 3309(b).

The corresponding Colorado statutory provision, section 8–70–103(10)(g)(I), C.R.S. 1973, originally defined exempted employment as service performed "[i]n the employ of a church, convention or association of churches. . . . " It is the Division's interpretation of this statutory language which is at issue in this case. In 1979, the General Assembly amended this provision, adding

---

1. This case was transferred here from the Court of Appeals under sections 13–4–110(1)(a) and –102(1)(b), C.R.S. 1973 because it involves a constitutional question.

2. The requirements for federal approval are contained in 26 U.S.C. §§ 3304 and 3309 (1976 ed. and Supp.IV), and the Secretary of Labor annually reviews and certifies each state plan. §§ 3304(a) and (c).

the clause "or in the employ of an organization which is operated primarily for religious purposes." Colo.Sess.Laws 1979, ch. 67, 8–70–103 at 345. At the urging of the Division, which expressed concern that federal credit might be lost if the wording of Colorado's statute departed from that of the federal provision, the General Assembly again amended this provision in 1980 to add language tracking § 3309(b) of the federal statute. Colo.Sess.Laws 1980, ch. 59, 8–70–103 at 462. The current provision exempts services performed

> [i]n the employ of a church, convention, or association of churches or in the employ of an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches.

Section 8–70–103(10)(g)(I), C.R.S. 1973 (1981 Supp.).[3]

Neither Colorado's Act nor FUTA contains a definition of "church." The 1970 United States House of Representatives Report on § 3309, discussing the language used both in § 3309(b)(1) of FUTA and section 8–70–103(10)(g)(I) of Colorado's Act, stated:

> This paragraph excludes [from unemployment tax payment] services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and is operated, supervised, controlled, or principally supported by a church (or convention or association of churches).

H.R.Rep.No.91–612, p. 44 (1969) (The Senate Report contained identical language. See S.Rep.No.91–752, pp. 48–49 (1970) U.S. Code Cong. & Admin.News 1970, pp. 3606), quoted in St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 781, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981).

Following an initial decision by the Division denying Young Life an exemption from unemployment tax as a "church," Young Life sought a hearing on its exclusion. After the hearing, on September 27, 1979, the Division issued its final review decision in which it determined that Young Life was not a "church" for purposes of the unemployment tax exemption. The Division made extensive findings of fact, including the following:

3. The headquarters of the employer are located in Colorado Springs. Out of a total of approximately 650 full time staff personnel employed by Young Life, about 80 are located at the headquarters.

4. The headquarters staff provides various services to the local "chapters," which are usually run by volunteers who comprise the local "committee." Services which the headquarters staff provide are accounting, data processing, training of personnel, fundraising, planning, and communications.

5. The employer has no private unemployment benefits plan. Some workers have received severance pay upon leaving the organization, but whether a severance allowance will be paid and how much the individual will get is totally within the discretion of the administration. Young Life hires and fires workers in diverse categories of expertise and functions.

6. The employer has no official connection with any local church congregation nor with any denominational church body, being operated under policies set by the board of trustees and carried out by the administrative staff.

7. The employer derives some income from certain of its camping and recreational programs by charging fees to participants (often paid on their behalf by others). However, it is funded primarily by private donations. Of the income from private contributions, 73% comes

---

3. The addition in the current statute of the clause extending unemployment tax exemption to religious organizations under the control of a church does not significantly distinguish the current statute from the 1978 version for pur-

poses of the issue before this Court. We make no determination concerning the status of Young Life as a "religious organization" under the 1979 version of the statute.

from individuals, with another 8–9% coming from various local church congregations, another 8–9% coming from private foundations and trusts, and another 5% coming from businesses.

8. The employer operates ranches and camps for youths in various parts of the country. Fees charged to participants help pay for running these facilities. There are both paid staff personnel and volunteers running the camps, which provide youths with a variety of recreational activities, including hiking, swimming, skiing, camping, and other similar activities.

9. The "club meeting" is the most important feature of the Young Life program. Any teenage person can attend regardless of his religious affiliation. There is no "membership" in a club. At the meetings there is singing, reading of minutes, announcements, performance of skits, and a religious message.

10. The local committees, working under the regional directors, oversee the conduct of the club meetings and other activities of the local chapter. Committee members are usually adult volunteers.

11. Young Life is exclusively devoted to working with young people. There is no Young Life program for senior citizens, nor for middle-aged Christians. Young Life does not intend to be the full religious experience of the youths. It is the intent and purpose of Young Life to get teenagers involved with local church congregations.

12. The purpose and function of Young Life is that of a youth organization taking the Christian message to youngsters.

Final Review Order at 3–4.

The Division, recognizing that neither Colorado's Employment Security Act nor FUTA defines "church," and that it is "an ambiguous term with a variety of meanings," noted three common definitions of church: a "local congregation," a "denominational organization" and a local house of worship. See Whelan, *"Church" in the Internal Revenue Code: The Definitional Problems,* 45 *Ford.L.Rev.* 885 (1977). The

Division concluded that Young Life did not fit under any of these common definitions. It noted that most definitions of church include groups which engage in one or more of the following activities:

(a) [forming] an association together of an indefinite number of persons into an identifiable entity, persons identified as members in an organization, "congregation", "community", or "fellowship" of believers;

(b) [professing] adherence to the same general creed, a sincere following of a set of beliefs or a specific religious viewpoint;

(c) [celebrating] the same rites, joining in the rituals and ceremonies inherent in their beliefs, providing a sincere and meaningful religious experience for members;

(d) promoting the spirituality of its members, watching over the spiritual welfare of each other, promoting the adherence to beliefs, promoting the spread of their beliefs among others;

(e) providing for the granting of ecclesiastical authority, such as ordination of ministers, [and] selection of leaders and teachers;

(f) establishing programs to provide education in the creed, doctrines, and beliefs of the church to members and children; and

(g) establishing themselves at a specific house or location for religious services.

Final Review Order at 5–6. See 66 *Am. Jur.2d, Religious Societies,* § 1 at 756 (1973).

The Division also found important the fact that church congregations normally cross all sex and age barriers and that church membership is usually exclusive, with persons not normally belonging to more than one church. The Division determined that Young Life did not meet either of these latter two criteria, noting especially that Young Life encouraged "dual membership" and its objective was to get young people more involved with local congregations. The Division also found that the "congregation" aspect of a church was missing, stating:

Young Life has no membership at all. There is no continuity. Participants could be different every week. This absence of an identifiable group associating voluntarily together for fellowship is a serious departure from the normal meaning of "church." Typically, the church in the usual sense draws its financial support from its members. Young Life has no program for the club attendees to support it in the same way.

Final Review Order at 6.

Finally, the Division determined that denying Young Life an exemption did not violate the First Amendment to the U. S. Constitution, nor did it constitute unlawful discrimination under *Colo.Const.* Art. II, § 4. The Denver district court affirmed the Division's ruling.

Young Life argues that to deny it an exemption from unemployment taxes while granting the exemption to other religious organizations, more traditional in form but which perform the same functions, violates the guarantees of religious freedom contained in the First Amendment to the U. S. Constitution, which provides: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." Young Life also challenges its exclusion from the unemployment tax exemption under Article II, § 4 of the Colorado Constitution, the state guarantee of freedom of religion, and under equal protection.

At the outset, it is important to emphasize two points. First, Young Life does not contend that unemployment taxation is offensive to the tenets of belief subscribed to by the Young Life organization or its members. *Cf. Johnson v. Motor Vehicle Division,* 197 Colo. 455, 593 P.2d 1363 (1979), *cert. denied* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (members of religious sect whose beliefs forbade their being photographed challenged statutory requirement that a driver's license bear a photograph of

the licensee). Second, Young Life concedes that the church exemption in Colorado's unemployment tax statute is not constitutionally mandated. Young Life admits that *all* churches might be required to pay an unemployment tax without violating the free exercise or establishment of religion provisions. The only issue before us, then, is whether the Division's definition of "church," which allows an exemption from tax for traditional churches but excludes Young Life from the definition, violates constitutional guarantees.

## I.

■ We begin by addressing Young Life's contention that excluding Young Life from the church exemption violates the First Amendment Establishment Clause. The central purpose of the Establishment Clause is to ensure governmental neutrality in matters of religion. As the United States Supreme Court declared in *Everson v. Board of Education,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1946),

> The [Establishment Clause] means at least this: neither a state nor the federal government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.

*See Larson v. Valente,* —— U.S. ——, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); *Epperson v. Arkansas,* 393 U.S. 97, 103–104, 89 S.Ct. 266, 269–270, 21 L.Ed.2d 228 (1968). Young Life argues that the effect of restricting the church exemption to traditional church organizations is to prefer and advance those organizations over an organization of unorthodox structure like Young Life. Such an effect, according to Young Life, while it does not directly or explicitly establish a state religion, represents state discrimination among different forms of religious expression in violation of the Establishment Clause prohibition.[4]

---

4. Young Life's discrimination claim implicates equal protection principles, and Young Life argues that the Division's decision constitutes an independent violation of federal and state constitutional guarantees of equal protection.

Without rejecting Young Life's equal protection analysis, we choose to address the claimed violation of governmental neutrality as an Establishment Clause problem. *See Gillette v. United States,* 401 U.S. 437, 449 n. 14, 91 S.Ct.

In *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), upholding the constitutionality of a state property tax exemption for churches, the Supreme Court outlined the proper attitude of government toward religion as one of "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.* at 669, 90 S.Ct. at 1412. *See Everson v. Board of Education, supra.* Subsequent decisions applied a three-pronged test for determining whether government action is within the permitted boundaries of this benevolent neutrality: First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion. *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Americans United for Separation of Church and State v. Colorado,* 648 P.2d 1072 (Colo.1982). The three-pronged test is intended as a guide to analysis of a constitutional provision couched in broad terms. Its specificity should not obscure the fundamental aim of the Establishment

Clause—the prevention of religious discrimination. *See Larson v. Valente, supra.*

Under the first prong of analysis, Young Life does not dispute the secular purpose of the unemployment compensation system in general or of the church exemption, which, while not necessarily constitutionally mandated,[5] evidently was intended to extend unemployment insurance coverage to as large a group of workers as possible while maintaining the fiscal separation of church and state consistent with constitutional principles. *See* Whelan, *"Church" in the Internal Revenue Code: The Definitional Problems, supra;* H.R.Rep.No.94–755, p. 1–2 (Purpose of unemployment tax provisions to extend coverage to "substantially all of the nation's wage and salary earners" and "provide equal treatment of all the nation's wage and salary workers."), *quoted in St. Martin Evangelical Lutheran Church v. South Dakota, supra* 451 U.S. at 786, n. 19, 101 S.Ct. at 2150, n. 19.

Young Life concedes that its religious doctrine is no different from that of traditional Protestant sects. This concession supports the conclusion that the Division's interpretation of the scope of the exemption was not motivated by an invidious purpose.

828, 836 n.14, 28 L.Ed.2d 168 (1971); *Walz v. Tax Commission,* 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970) (opinion of Harlan, J.) (Analysis of neutrality in application of religiously-based tax exemption under First Amendment requires "an equal protection mode of analysis."). We recognize, however, that while under normal circumstances classifications made as part of the implementation of a governmental social welfare program need only be nonarbitrary in nature, *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1969); *Manor Vail Condominium Association v. Town of Vail,* 199 Colo. 62, 604 P.2d 1168 (1980), the nature of the religious freedoms guaranteed under the First Amendment mandates a more searching evaluation of a classification of religious organizations. *See, e.g., McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *United States v. Carolene Products Co.,* 304 U.S. 144, 152–153, n. 4, 58 S.Ct. 778, 783–784, n. 4, 82 L.Ed. 1234 (1938) ("[L]egislation [may] be subjected to more exacting judicial scrutiny ... [if] directed at particular religious ... minorities....") *citing Pierce v. Society of Sisters,*

268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). *See also, L. Tribe, American Constitutional Law,* § 16–9 (1978). While equal protection principles inform our analysis, our conclusion that Young Life's exclusion from exemption satisfies Establishment Clause neutrality principles resolves as well that the exclusion from exemption is neither arbitrary nor invidious under equal protection. *See Gillette v. United States, supra* at n. 14.

5. *See Gillette v. United States,* 401 U.S. 437, 453 and 461, n. 23, 91 S.Ct. 828, 838 and 842, n.23, 28 L.Ed.2d 168 (1971) (Exemption from draft for conscientious objectors not mandated by Constitution but nevertheless represents attempt to accommodate free exercise values.); *Walz v. Tax Commission, supra* 397 U.S. at 673, 90 S.Ct. at 1413 ("The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.").

Moreover, in the final review order itself, the Division explicitly declared:

> The different treatment [of Young Life] under the law has nothing to do with [its] religious beliefs or religious practices. The legislative decision to cover the employees of some employers and exempt the employees of others is supported by the social policies underlying unemployment insurance.

Under the second prong of Establishment Clause analysis, we must scrutinize the exemption to determine whether its principal or primary effect is discriminatory. *See Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). Given the purpose of the exemption—coverage of the maximum number of workers with minimal impact on religious worship—the effect of the Division's interpretation of the church exemption is not to distinguish between Young Life and traditional churches in such a way as to violate Establishment Clause principles. The Establishment Clause case most directly analogous in this respect is *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). In *Gillette,* individuals who sought exemption from military service because of their conscientious objection to participation in the Vietnam war raised Free Exercise and Establishment Clause challenges to § 6(j) of the Military Selective Service Act of 1967, which provides that no person shall be subject to "service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." The Supreme Court rejected a challenge under the Establishment Clause to § 6(j)'s distinction between those whose religious beliefs dictate that they not participate in any war, and those whose beliefs require them to refrain from participation in a particular war, holding that the exemption for conscientious objectors has a neutral secular basis and that limiting the exemption to objectors to all war furthers the valid neutral purpose of "maintaining a fair system for determining 'who serves when not all serve.'"

The Court pointed out that "the claim to relief on account of [objection to a particular war] is intrinsically a claim of uncertain dimensions, ... and granting the claim in theory would involve a real danger of erratic or even discriminatory decisionmaking in administrative practice." *Id.* at 455, 91 S.Ct. at 839. The Court concluded:

> [I]t is not inconsistent with orderly democratic government for individuals to be exempted by law, on account of special characteristics, from general duties of a burdensome nature. But real dangers—dangers of the kind feared by the Commission—might arise if an exemption was made available that in its nature could not be administered fairly and uniformly over the run of relevant fact situations.

> In light of these valid concerns, we conclude that it is supportable for Congress to have decided that the objector to all war—to all killing in war—has a claim that is distinct enough and intense enough to justify special status, while the objector to a particular war does not.

*Id.* at 460, 91 S.Ct. at 841.

The principle of *Gillette* is that it is sufficient to defeat an Establishment Clause challenge to the scope of an exemption from a burdensome government-imposed duty to show that the scope of the exemption is instrumental in facilitating fair administration of the system and that the exemption makes distinctions based on real differences related to the purposes of the system. *Gillette* should not be read to hold that mere administrative convenience outweighs religious concerns. The Court in *Gillette* emphasized that only where the purposes served by the governmental program are very important, and where administration of the program with the exemption would be threatened by altering its scope, will distinctions based in part on religion withstand a First Amendment challenge.

The exclusion of Young Life from unemployment tax exemption is analogous to the exclusion of opponents to a particular war from the conscientious objector exemption

upheld in *Gillette.* A meaningful distinction can be made between Young Life and traditional churches in light of the valid concerns behind a church exemption limited in scope. According to the Division, Young Life employs about 80 full-time workers at the organization's headquarters in Colorado Springs.[6] Many of the functions carried out by these employees are administrative in nature, including accounting, data processing, training of personnel, fundraising, planning, and communications. These workers perform functions identical to those of workers in secular organizations of comparable size. It is entirely reasonable that the unemployment compensation scheme should encompass these workers.

Of primary significance is the Division's finding that Young Life has no continuing membership or congregation. In ministering to the religious needs of a single age group, Young Life does not foster the kind of continuity and continuing loyalty that other church organizations maintain. As the Division noted in its findings:

> Typically, the church in the usual sense draws its financial support from its members. Young Life has no program for the

club attendees to support it in the same way.

In light of this finding, the Division determined that Young Life would be less likely than church organizations to provide on a voluntary basis a continuing means of support for Young Life workers who leave the organization and remain unemployed. We find this a valid basis upon which to distinguish Young Life from exempted churches. *See Vic Coburn Evangelistic Association v. Employment Division,* 35 Or.App. 655, 582 P.2d 51 (1978).[7]

We also must independently determine under Establishment Clause principles whether Young Life's exclusion from the church exemption fosters excessive governmental entanglement with religion. *See Lemon v. Kurtzman, supra.* This contention need only be addressed to a limited extent in light of Young Life's concession that the unemployment tax constitutionally could be applied to traditional churches presently exempted from the scheme. Young Life's excessive entanglement claim therefore is limited to the contention that the *determination* of whether Young Life is a church for purposes of the exemption constitutes impermissible involvement of

---

**6.** The Division found that Young Life employs approximately 650 full-time staff personnel, with about 80 employed at the Colorado Springs headquarters. The record indicates that Young Life operates throughout the United States and in several foreign countries. It does not indicate how many employees beyond the 80 headquarters staff are employed in Colorado.

**7.** Our holding does not mean that an exemption which encompassed Young Life necessarily would be impermissible. While an exemption which included any organization claiming to be a church would be impractical, *see DeLaSalle Institute v. United States,* 195 F.Supp. 891 (N.D.Cal.1961), we reach no conclusion on whether constitutional principles would prevent the legislative enactment of a wider exemption, or an interpretation of language identical to the Colorado statute so as to include Young Life. *See, e.g., Young Life Campaign v. Patino,* 122 Cal.App.3d 559, 176 Cal.Rptr. 23 (1981).

Young Life urges that a different result is dictated by the U. S. Supreme Court's recent decision in *Larson v. Valente,* —— U.S. ——, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), which invalidated a Minnesota statute exempting

from compliance with registration and reporting requirements only those religious organizations that receive more than half of their total contributions from members or affiliated organizations. While acknowledging that the state interest furthered by the registration and reporting statute—protection of citizens from fraudulent practices in the solicitation of funds for charity—is a "valid secular purpose," the Court found no nexus between this purpose and the "fifty percent" rule. Our conclusion that the Division's justification for distinguishing Young Life from a church is connected to the valid purpose of providing the widest possible unemployment coverage to those in need of it distinguishes this case from *Larson.* The Supreme Court also indicated that it was not satisfied that the enactment of the fifty percent rule was motivated by solely secular concerns. Examining the legislative history of the provision, the Court found that it demonstrated that "the provision was drafted with the explicit intention of including particular religious denominations and excluding others." 102 S.Ct. at 1688. Here, we do not find, nor did Young Life contend, that either the Act or the Division's ruling was invidiously motivated.

the state in religious activities. Young Life points out that this determination has necessitated several proceedings during the past five years in which evidence was adduced concerning Young Life's doctrinal creeds, religious beliefs and practices, time, place and manner of worship services, sacraments administered, religious organizational affiliations, terminology and sources of financial support. This, Young Life argues, is the kind of entanglement the Supreme Court found constitutionally proscribed in *Lemon v. Kurtzman, supra,* in which the court invalidated a state program providing for a salary supplement to non-public school teachers and a subsidy program to "purchase" certain "secular educational services" from non-public schools.[8]

We note that Young Life itself initiated all the administrative and judicial proceedings following the Division's initial determination that it was not a church. Had Young Life agreed to pay the unemployment tax as determined in the first instance by the Division, by far the majority of government scrutiny directed at the organization would not have occurred. As to the substance of the entanglement issue, we find no excessive entanglement. Any tax exemption for religious organizations entails an examination of whether a particular group or organization meets the statutory requirement for exemption. Thus, the entanglement problem claimed by Young Life occurs with respect to every religious tax exemption. Such exemptions are clearly constitutional. *Walz v. Tax Commission, supra.* Numerous government programs, both federal and state, entail contact between the government and religious-affiliated institutions. *See Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Americans United, supra.* "Some relationship between government and religious organizations is inevitable," *Lemon v. Kurtzman, supra* 403 U.S. at 614, 91 S.Ct. at 2112, and "there may be myriad forms of involvements of government with religion which do not import [the dangers feared by the Framers]." *Walz v. Tax Commission, supra* 397 U.S. at 681, 90 S.Ct. at 1417 (Brennan, J., concurring). Simply determining the applicability of a statutory exemption to a particular group does not con-

**8.** While we are not required to resolve the issue, we note that the assumption that administering the unemployment tax system with respect to Young Life does not constitute excessive entanglement is supportable under the analysis employed in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In *Lemon v. Kurtzman,* state statutes providing state reimbursement to parochial schools for teachers' salaries, textbooks and instructional materials were struck down as necessitating undue involvement in school affairs. The Supreme Court noted that, under one statute, participating schools were required to identify the cost of secular educational services by prescribed accounting procedures subject to state audit; under the other, teachers receiving salary supplements were required to sign a written statement agreeing not to teach religious courses. In general, the Court found excessive entanglement in the continuing state surveillance required to ensure compliance with the statutes.

We recognize that the question of entanglement is inescapably one of degree, and as a general rule an exemption will represent less entanglement than taxation. *Walz v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). This in itself is not sufficient reason to impose a blanket constitutional preference in favor of religious exemptions. It is noteworthy that the Supreme Court in *Walz,* in upholding the constitutionality of property tax exemptions for religious institutions, did not hold that such exemptions are constitutionally *mandated* by entanglement concerns.

Incident to the ongoing administration of the unemployment tax system, the Division is required to examine Young Life's records to determine taxes owed and employees involved, and Young Life must maintain such records as the Division deems necessary. Section 8–72–107, C.R.S. 1973 (1981 Supp.). This involvement on the Division's part with Young Life's affairs is not of the same magnitude as that condemned in *Lemon v. Kurtzman, supra. See Ascension Lutheran Church v. Employment Security Commission,* 501 F.Supp. 843 (W.D.N.C. 1980); *Matter of Northwestern Lutheran Academy,* 290 N.W.2d 845 (S.D.1980) *rev'd on other grounds, sub nom. St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981). *But see* M. Doughty, *Religious Organizations and the Unemployment Insurance Code: Is California Playing Favorites with Churches?,* 10 Pacif.L.J. 225 (1978).

stitute "a union of government and religion [which] tends to destroy government and degrade religion." *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). *Cf. NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); M. Doughty, *Religious Organizations and the Unemployment Insurance Code: Is California Playing Favorites with Churches?,* 10 *Pacif.L.J.* 225 (1978).

## II.

Young Life's challenge under the Free Exercise Clause is based on its contention that the Division's interpretation of the definition of "church" to exclude Young Life impermissibly burdens Young Life's religious practices and provides incentives for the organization to abandon its unorthodox manner of worship and adopt the trappings of traditional church institutions. Young Life analogizes this case to *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), in which the United States Supreme Court held that denial of unemployment benefits to an individual whose religious beliefs prompted her to refuse to work on Saturdays violated the Free Exercise Clause because the burden on the individual's practice of her religious beliefs was not justified by a sufficiently compelling state interest.[9]

It is axiomatic that the freedom to hold religious beliefs is absolute, and no program which discriminates on its face against a particular religious doctrine will satisfy constitutional inquiry. *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). However, actions taken in accord with religious belief may be subject to incidental burdens imposed by

government. *United States v. Lee,* —— U.S. ——, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner, supra.* If the state regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance permissible goals of the state, a statute may be valid despite its indirect burden on religious observance unless the state can accomplish its purpose by means which do not impose such a burden. *Braunfeld v. Brown, supra.* In cases where a significant conflict between permissible goals of the state and religious practices exist, a balancing test is used to measure whether the state has exceeded its constitutional power. *Thomas v. Review Board, supra; Sherbert v. Verner, supra.* In order to outweigh a substantial burden on religiously motivated activity, the state aim involved must be compelling and the state action must be the least restrictive means of achieving the goal. *United States v. Lee, supra; Thomas v. Review Board, supra; Wisconsin v. Yoder, supra; Sherbert v. Verner, supra; Johnson v. Motor Vehicle Division,* 197 Colo. 455, 593 P.2d 1363 (1979), *cert. denied* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116.

Young Life, by conceding that the unemployment scheme constitutionally could be applied to all churches, admits that the state's interest in providing for unemployment relief is sufficiently weighty to meet the Free Exercise balancing test. The importance of unemployment relief is indicated by the legislative declaration of pur-

---

**9.** The Supreme Court recently reaffirmed the *Sherbert* holding in *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), declaring unconstitutional the denial of unemployment benefits to a Jehovah's Witness who quit his job when he was transferred to a department engaged directly in the production of weapons, an activity he claimed violated the principles of his religion. The Court described the inroad on religious freedom involved as follows:

> Where a state conditions receipt of important benefits upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id.,* at 718, 101 S.Ct. at 1432.

pose contained in section 8–70–102 of the Act, which provides that because "[e]conomic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state . . ., the public good and general welfare of the citizens of this state require the enactment" of an unemployment compensation scheme. Section 8–70–102, C.R.S. 1973.

That the implementation of a widespread system of social welfare may be deemed a sufficiently weighty interest to outweigh incidental burdens on religion is indicated by the United States Supreme Court's decision in *United States v. Lee, supra,* where the Court denied an exemption on constitutional grounds to an Amish employer who claimed that payment of the employer's share of the Social Security tax would violate his religious beliefs. The Court found that, considering the minimal nature of the burden of paying the tax, the impact on the orderly administration of the Social Security system of imposing a court-fashioned exemption to accommodate religiously-motivated objections would be unjustified. *See also Braunfeld v. Brown, supra. Cf. Thomas v. Review Board, supra; Sherbert v. Verner, supra.* Moreover, our conclusion that the scope of the church exemption as construed by the Division does not constitute impermissible religious discrimination under Establishment Clause principles indicates that the governmental interests involved are of a kind and weight sufficient to justify the scope of the exemption under the Free Exercise Clause. As the Supreme Court held in *Gillette v. United States, supra,* where substantial governmental interests are directly related to the imposition of a particular burden, and where the refusal to exempt a party from that burden is motivated by a valid, neutral purpose and the limited scope of the exemption is dictated by important concerns relating to the administration of the government program, the Free Exercise Clause does not prohibit incidental burdens on religiously-motivated actions. 401 U.S. at 461, 91 S.Ct. at 842.

Here, the incidental burden on Young Life, a contribution to the unemployment insurance fund, is minimal. *See Johnson v. Motor Vehicle Division, supra. But see Christian School Association v. Commonwealth Department of Labor,* 55 Pa. Cmwlth. 555, 423 A.2d 1340 (1980) (Imposition of unemployment tax scheme on religious schools deemed significant burden.). In weighing this burden against the compelling state interest in an easily administered unemployment benefits scheme of widest possible coverage, *see United States v. Lee, supra,* we conclude that no unconstitutional burden on the free exercise of religion exists here. *See Gillette v. United States, supra; Braunfeld v. Brown, supra; Johnson v. Motor Vehicle Division, supra.*

III.

Young Life's final contention is that the Division's interpretation of the church exemption violates the prohibition against discrimination among religions contained in Article II, § 4 of the Colorado Constitution. *Colo.Const.,* Art. II, § 4 provides in pertinent part:

> The free exercise and enjoyment of religious profession and worship, without discrimination, shall . . . be guaranteed. . . . No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. Nor shall any preference be given by law to any religious denomination or mode of worship.

We have recently had occasion to discuss in some detail the relationship between this provision of the state constitution and the First Amendment to the United States Constitution in *Americans United, supra:*

> Although the provisions of Article II, Section 4 are considerably more specific than the Establishment Clause of the First Amendment, we read them to embody the same values of free exercise and governmental non-involvement secured by the religious clauses of the First Amendment. The Colorado constitution expressly guarantees to all persons the right, in matters of religion, to choose their own course free of any compulsion from the state. To secure this right, it

removes from the political sphere any form of compulsory support or preference in matters of religion. In this respect Article II, Section 4 echoes the principle of constitutional neutrality underscoring the First Amendment. That principle prohibits the type of governmental involvement that leads to restraint on free choice in religious matters or to control of churches. *Walz v. Tax Commission [supra].*

*Id.,* 648 P.2d at 1081–1082. *See People ex rel. Vollmar v. Stanley,* 81 Colo. 276, 255 P. 610 (1927). The conclusion of *Americans United* that Article II, Section 4, while more specific than the First Amendment, embodies the same principles as those enunciated in United States Supreme Court cases interpreting the federal provision is consistent with our prior decisions in *Johnson v. Motor Vehicle Division, supra,* and *Pillar of Fire v. DURA,* 181 Colo. 411, 509 P.2d 1250 (1973) (*Pillar of Fire I* ), in which challenges under both state and federal freedom of religion clauses were analyzed under the prevailing First Amendment standard.

Nevertheless, Young Life argues that because the state provision proscribes "any preference" to any religious denomination or mode of worship, it focuses with more particularity on the discrimination issue which is raised before this Court and therefore requires a separate inquiry. We see this concern with discrimination as clearly subsumed under our discussion in Part I dealing with the First Amendment Establishment Clause. To the extent that the state provision justifies a separate inquiry, we determine that the Division's decision does not violate the Article II, Section 4 proscription against "preference" for "any religious denomination or mode of worship." Young Life is neither a denomination nor a mode of worship as those terms are used in the state constitution. Although the religious beliefs of Young Life's participants are consistent with traditional Protestant Christian doctrine and many of the group leaders involved in Young Life meetings are ministers ordained by orthodox Protestant sects, the primary purpose of Young Life's activities is to direct and encourage young people toward involvement in traditional church congregations which exist independently of Young Life. In light of these facts, we cannot conclude that Young Life is a separate "religious denomination" within the meaning of Article II, Section 4.

Neither do the Young Life meetings represent a "mode of worship" different for constitutional purposes from traditional Christianity. Young Life emphasizes that instead of services in a traditional church, religious worship in Young Life is conducted within the context of a "club meeting," an informal service usually conducted on a weekday evening in a private home. Young Life admits that the purpose of these meetings is to introduce young people to Christian teachings and engender general fellowship. Such purposes are shared by many evangelical organizations, youth groups, and recreational camping groups, which strive to provide contact with tenets of the Christian faith but do not intend to provide a worshipper's sole religious experience. *See Vic Coburn Evangelistic Association v. Employment Division, supra.* These purposes do not support Young Life's characterization of group activities under its auspices as a "mode of worship."

Because, as we concluded in earlier portions of this opinion, the Division's exclusion of Young Life from the church exemption was based on an analysis of Young Life as an organization and not on its religious doctrines or method of worship, and because the Young Life organization does not constitute a distinct "religious denomination or mode of worship," Young Life's claim under the Colorado Constitution is without merit.

Judgment affirmed.

LEE, J., does not participate.