**SEMECO INDUSTRIES, INC., Petitioner,**

v.

**AUDITING DIVISION OF THE UTAH STATE TAX COMMISSION, Respondent.**

No. 900494.

Supreme Court of Utah.

April 1, 1993.

R. Paul Van Dam, Atty. Gen., Rick Carlton, Asst. Atty. Gen., Salt Lake City, for Tax Com'n.

Alan D. Boyack, St. George, and Matthew Hilton, Spanish Fork, for SEMECO.

HOWE, Associate Chief Justice:

SEMECO Industries, Inc., seeks review of the denial of its application for a certificate of sales tax exemption which it sought from the Utah State Tax Commission. In its application, SEMECO asserted that it was both a religious institution and a charitable institution, exempt from sales tax under Utah Code Ann. § 59–12–104(8) (Supp.1991).

SEMECO is a Utah nonprofit corporation. Its name is an acronym for Seventh-

day Adventist Educational, Manufacturing, Engineering Company. The La Verkin, Utah, Seventh-day Adventist Church founded SEMECO in 1983 to provide jobs for local members and to raise money for a church school. Initially, SEMECO's principal economic activity was keeping bees and making bee boxes. Over the years, it has also become involved in providing various community and welfare services, such as a transient shelter, job opportunities, daycare and retirement centers, smoking cessation clinics, and educational seminars in cooking, arts and crafts, gardening, and health. These services were utilized primarily by members of the La Verkin Seventh-day Adventist congregation, although others occasionally participated. It charged nominal fees for some of the clinics and seminars, and it also expected those benefiting from the transient shelter and the retirement center to help defray costs, either in cash or through service in kind.

Until 1988, the La Verkin Seventh-day Adventist Church controlled and operated SEMECO as an auxiliary church school industry, allowing it to use the same Utah sales tax exemption number assigned to the La Verkin church and to all Seventh-day Adventist congregations in Utah. On January 26, 1988, SEMECO severed its formal relationship with the La Verkin church. The severance took place under pressure from the Nevada–Utah Conference of the Seventh-day Adventist world church, apparently because the conference leaders hoped to distance the La Verkin church and the Nevada–Utah Conference from a lawsuit that threatened SEMECO. After the severance, however, individual Seventh-day Adventists in La Verkin continued to operate SEMECO, intending it to function as an "independent ministry" of the Seventh-day Adventist world church organization, unaffiliated with the local church or the regional conference. SEMECO's postseverance operation included twice-weekly worship services on Sabbaths and Tuesdays in addition to the same economic and welfare activities it had pursued before severance.

SEMECO applied to the Auditing Division of the Utah State Tax Commission for its own sales tax exemption, pursuant to Utah Code Ann. § 59–12–104(8). The Division denied the application, and SEMECO appealed the denial to the Commission. Before the Commission, the Auditing Division argued that SEMECO was neither a religious nor a charitable institution and that even if it were a qualified institution, its sales were not made in the conduct of its regular religious or charitable activities as required by section 59–12–104(8).

At the formal hearing before the Commission, the hearing officer and a commissioner questioned SEMECO's representative about its affiliation with other divisions of the Seventh-day Adventist Church and heard evidence about the extent to which SEMECO received or expected to receive some benefit in exchange for its charitable services. The Commission concluded that because SEMECO was not recognized by other Seventh-day Adventist groups and because its charitable activities "[were] not generally available to the public as a whole" and were not performed "without the expectation of gain," SEMECO was neither a religious nor a charitable institution. The Commission did not address whether SEMECO's sales were made in the conduct of its regular religious or charitable activities.

SEMECO contends that the Commission erred in determining that it was not a religious institution within the meaning of section 59–12–104(8). In its opening brief, it asserts that the actions of the Commission violated the United States and Utah Constitutions and served to "impede the ability of SEMECO and its members to express and exercise their religious beliefs" by denying it a sales tax exemption. Brief reference is made to three cases in support of those arguments.

We find no error in the Commission's denial. SEMECO was originally organized as a nonprofit corporation to operate an auxiliary church school *industry*. It used the sales tax exemption of the La Verkin church of which it was an auxiliary. After its severance from the church in 1988, it did not change the basic nature of its purpose and operation. It represented to the Commission that following the severance,

SEMECO continued its work "with the same principles, the same aims and everything about it the same." Thus, SEMECO remained an industry as before. It kept bees and made bee boxes, maintained a transient shelter, and provided education and training in cooking, arts and crafts, gardening, and other temporal matters. It did not attempt to duplicate or supplant the spiritual program of the La Verkin church to which all of SEMECO's members belonged.

Before the Commission, SEMECO claimed to be a religious organization because it was an independent ministry of the North American Division of the Seventh-day Adventist Church, without any affiliation with or connection to the La Verkin church of which it had been an auxiliary. It asserted that it could be an independent ministry by simply complying with certain guidelines promulgated by the world church and that no approval or acceptance was required by the world church. The guidelines were put into evidence. However, on cross-examination, SEMECO's president admitted that it had not complied with guideline 11, which requires that "the independent ministry will have on its guiding board or committee at least some individuals who currently represent the organized Seventh–Day Adventist Church." Thus it was clear that SEMECO had not fully complied with the guidelines, and the Commission had no alternative but to deny its application. SEMECO had formally applied to the world church to be recognized as an *industry*, but that application had not yet been acted upon.

SEMECO did not claim before the Commission, and does not claim before this court, that it is a religious institution in "its own right," unconnected to or unaffiliated with any other organization. It has always claimed to be part of the Seventh-day Adventist Church family. Indeed, it has no separate congregation from the La Verkin church; it has no separate creed, practices, or doctrine; and its members pay their tithes to the La Verkin church, not to SEM-ECO. While SEMECO does hold some separate worship services, the president explained that they are held for the benefit of its members who cannot attend the regular La Verkin church meetings. In no way did SEMECO claim or demonstrate that it is an independent, unaffiliated religious organization.

The Commission concluded by stating, "Nor is the fact that [SEMECO] conducts weekly prayer meetings and services for its membership sufficient to convert [SEMECO] from a business organization into a religious institution for purposes of the Sales Tax Act." We agree. Before its severance from the La Verkin church, SEMECO was an auxiliary of that church. After its severance, SEMECO continued as it had in the past. Nothing changed, according to its leader. Thus, the Commission did not err in concluding that the severance had not changed its character or converted it from a church industry auxiliary into a religious organization. SEMECO offered no generally recognized or accepted definition of "religious organization" with which its activities would comply.[1]

We do not reach the issue of whether SEMECO qualified as a charitable institution. Only vague references are made to this issue in SEMECO's brief. No authorities are cited, and the argument and analysis are entirely inadequate. We therefore decline to consider the issue. *State v. Wareham*, 772 P.2d 960, 966 (Utah 1989); *State v. Amicone*, 689 P.2d 1341, 1344 (Utah 1984). What a "charity" is under our case law is much too complex for us to decide without adequate briefing and analysis. *See Utah County v. Intermountain Health Care*, 709 P.2d 265, 269 (Utah 1985).

Affirmed.

HALL, C.J., and STEWART and ZIMMERMAN, JJ., concur.

---

1. *See United States v. Jeffries,* 854 F.2d 254 (7th Cir.1988) (outlining the 14–factor test of the Internal Revenue Service).

DURHAM, Justice, dissenting:

I respectfully dissent. The Tax Commission erred both in denying SEMECO a sales tax exemption as a charitable institution and in denying SEMECO an exemption as a religious institution. I would therefore vacate the Commission's rulings and remand for further consideration.

## I. STANDARDS OF REVIEW

SEMECO challenges the Tax Commission's determinations as abuses of discretion, as erroneous interpretations or applications of the law, and as violations of the state and federal constitutions. Before I address the merits of these claims, I believe an extensive consideration of the standards of review for each of the challenges is appropriate.

### A. Impact of UAPA

Because SEMECO seeks relief from an agency adjudication commenced after January 1, 1988, the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–1 to –22 (UAPA), governs review of the Tax Commission's determinations. *See* Utah Code Ann. § 63–46b–22(1) (Supp.1992). Section 63–46b–16 of UAPA prescribes the circumstances under which a reviewing court may grant relief to a party challenging final agency action based on a formal UAPA adjudication. Subsection (4) of this section provides that relief shall be granted only if the reviewing court determines that the aggrieved party

has been substantially prejudiced by any of the following:

(a) the agency action, or the statute or rule on which the agency action is based, is unconstitutional on its face or as applied;

(b) the agency has acted beyond the jurisdiction conferred by any statute;

(c) the agency has not decided all of the issues requiring resolution;

(d) the agency has erroneously interpreted or applied the law;

(e) the agency has engaged in an unlawful procedure or decision-making process, or has failed to follow prescribed procedure;

(f) the persons taking the agency action were illegally constituted as a decision-making body or were subject to disqualification;

(g) the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court;

(h) the agency action is:

(i) an abuse of the discretion delegated to the agency by statute;

(ii) contrary to a rule of the agency;

(iii) contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency; or

(iv) otherwise arbitrary or capricious.

Utah Code Ann. § 63–46b–16(4). Unfortunately, these provisions give little guidance concerning what standard of review the court should apply in determining whether any of the listed errors have occurred, and I therefore take the opportunity to examine the statute at length.

Before UAPA, this court had developed clear standards of review to apply to agency actions. For example, see *Utah Department of Administrative Services v. Public Service Commission*, 658 P.2d 601, 607–12 (Utah 1983) (*Administrative Services*), which contains the most comprehensive guide to the pre-UAPA standards. Section 63–46b–16(4) of UAPA upset these previously settled standards without indicating what standards should replace them. While some of the subsections of 63–46b–16(4) incorporate specific standards of review, *see Questar Pipeline Co. v. Utah State Tax Comm'n*, 817 P.2d 316, 317 (Utah 1991), most do not. Therefore, since UAPA's adoption, we have had to make our own determinations of what standards of review to apply to various types of challenges to formal agency adjudications.

To date, however, we have not developed a comprehensive guide to the proper standard of review applicable to each provision

of section 63–46b–16(4).[1]  Instead, in individual cases we have determined the standard of review for one or two of these provisions at a time.  *See, e.g., Questar,* 817 P.2d at 317–18; *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 583–89 (Utah 1991).  I submit that with a number of years of experience reviewing agency adjudications under UAPA, we are now able to provide a unified, comprehensive analysis of the proper standard of review for each provision.  Just as in *Administrative Services* we needed to clarify the standards of review we applied to all types of pre-UAPA administrative decisions, 658 P.2d at 607–12, we now need to summarize the standards of review applicable to each provision of section 63–46b–16(4).  I now discuss my views of our prior cases and conclude that the provisions for relief in subsections (4)(a) through (4)(f) call for correction of error review, while the provisions in subsections (4)(g) and (4)(h) call for reasonableness and rationality review.

### B.  Pre-UAPA Standards

*Administrative Services* established three levels of pre-UAPA review of agency action: (1) a no-deference, "correction of error" standard regarding interpretations of general questions of law; (2) an intermediate-deference, "reasonableness and rationality" standard regarding mixed questions of law and fact, questions of special law, questions of the application of law to fact, and questions of "ultimate fact"; and (3) a great-deference, "evidence of any substance whatever" standard regarding findings of basic fact.  658 P.2d at 608–12.  In practice, under pre-UAPA law the choice between no deference and intermediate deference often turned on whether the agency had experience or expertise regarding the specific issue.  *See, e.g., id.* at 610.  However, recent cases have established that section 63–46b–16(4) of UAPA altered the *Administrative Services* framework.

### C.  Subsections (4)(a), (4)(b), and (4)(c)

In *Questar Pipeline v. Tax Commission,* 817 P.2d 316 (Utah 1991), we first reviewed an agency action challenged under subsection 63–46b–16(4)(a), which allows relief for unconstitutional agency action.  We initially noted, "Although some of the subsections of section 63–46b–16(4) incorporate specific standards of review, taken individually, section 63–46b–16(4)(a) is not helpful in that regard."  *Id.* at 317 (citation omitted).  We then concluded that because constitutional challenges under subsection (4)(a) constitute general law questions, and because we had previously determined that general law questions are subject to correction of error review, *Savage Indus. v. Tax Comm'n,* 811 P.2d 664, 669–70 (Utah 1991), constitutional challenges would likewise be reviewed under a correction of error standard.  *Questar,* 817 P.2d at 318.

Similarly, subsection (4)(b), which permits appellate relief if the agency has acted beyond its jurisdiction, and subsection (4)(c), which permits relief if the agency has not decided all the issues, do not incorporate specific standards of review.  We considered subsection (4)(b) in *Bennion v. ANR Production Co.,* 819 P.2d 343, 349 (Utah 1991), and held that challenges under subsection (4)(b) also presented questions of general law appropriate for correction of error review.  *Cf. Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 585 & n. 10 (Utah 1991).  This court has not previously considered subsection (4)(c), but I believe it also involves issues of general law subject to no-deference review.  Appellate courts should therefore apply a correction of error standard in reviewing all challenges under subsections (4)(a), (4)(b), and (4)(c).

### D.  Subsection (4)(d)

We decided in *Savage* that under subsection (4)(d), just as under pre-UAPA law, a correction of error standard applies to appellate review of agency interpretations of "general law," also described as those laws

---

1.  The Utah Court of Appeals has recently noted that "the controlling precedent from the Utah Supreme Court is less than clear" and has undertaken its own extensive review of the area in *King v. Industrial Comm'n,* No. 920464–CA, —— P.2d —— (Utah Ct.App. March 18, 1993).

that the "appellate court is as well suited to decide ... as is the agency." 811 P.2d at 668. What *Savage* left unresolved regarding subsection (4)(d) was whether questions of interpreting specific law and questions of applying law to fact also should receive correction of error review. Under pre-UAPA law, we would have given these questions reasonableness and rationality review, as long as the agency had experience or expertise in resolving the specific issue. *See id.* But by using the word "erroneously" and incorporating under one provision issues of application of law, interpretation of general law, and interpretation of specific law, subsection (4)(d) seemed to upset the pre-UAPA framework for distinguishing issues suited for intermediate review from issues suited for no-deference review.

We comprehensively analyzed subsection (4)(d) in *Morton International, Inc. v. Auditing Division*, 814 P.2d 581 (Utah 1991). Regarding the pre-UAPA framework, we stated:

> A review of our recent [pre-UAPA] cases ... makes it clear that it is not the characterization of an issue as a mixed question of fact and law or the characterization of the issue as a question of general law that is dispositive of the determination of the appropriate level of judicial review. Rather, what has developed as the dispositive factor is whether the agency, by virtue of its experience or expertise, is in a better position than the courts to give effect to the regulatory objective to be achieved.

*Id.* at 586. But we then went on to explain that UAPA had indeed altered the standard of review and that under section 63–46b–16, experience and expertise were no longer dispositive:

> [N]othing in the language of section 63–46b–16 or its legislative history suggests that an agency's decision is entitled to deference solely on the basis of agency expertise or experience.... Rather, in granting judicial relief when an "agency has erroneously interpreted or applied the law," the language of section 63–46b–16(4) clearly indicates that ... a correction of error standard is used in re-

viewing an agency's interpretation or application of a statutory term.

*Id.* at 588.

*Morton* thus made it clear that under subsection (4)(d), a reviewing court should not grant intermediate deference to an agency's interpretation or application of law. *Morton* went on to explain, however, that some agency interpretations or applications of law might require review under subsection (4)(h)(i), which permits appellate relief for "an abuse of the discretion delegated to the agency by statute." *See id.* at 588–89. If the specific agency interpretation or application was an exercise of the agency's statutorily delegated discretion, then under subsection (4)(h)(i), which I discuss further below, the agency's interpretation or application of law should receive intermediate deference. But absent a delegation of discretion, appellate courts should review with no deference all claims of erroneous interpretation or application of law. Thus, I would now add subsection (4)(d) to the group of UAPA relief provisions subject to correction of error review.

### E. Subsections (4)(e) and (4)(f)

This court has not previously addressed the standard of review under subsections (4)(e) and (4)(f). Like subsections (4)(a), (4)(b), and (4)(c), these provisions do not incorporate specific standards of review. By their terms, however, both provisions concern legal error, as do subsections (4)(a) through (4)(d). Subsection (4)(e) permits relief for "unlawful" agency procedure, and subsection (4)(f) permits relief for an "illegally constituted" decision-making body. Having already concluded that subsections (4)(a) through (4)(d) call for correction of error review, I believe the same no-deference standard should also apply to subsections (4)(e) and (4)(f).

### F. Subsection (4)(g)

In contrast to most of the preceding subsections, subsection (4)(g) explicitly incorporates a specific standard of review, permitting appellate relief when an agency's finding of fact "is not supported by substantial

evidence when viewed in light of the whole record before the court." Under pre-UAPA law, appellate courts upheld agency findings of fact supported by "evidence of any substance whatever," and in *Administrative Services* we indicated that this prior standard "provide[d] less latitude for judicial review ... than the 'substantial evidence' standard specified in the Federal Administrative Procedure Act." 658 P.2d at 609. Therefore, after UAPA's enactment we faced the question of whether subsection (4)(g)'s "substantial evidence" standard marked a change from the pre-UAPA "evidence of any substance" standard.

In *First National Bank of Boston v. Salt Lake County Board of Equalization*, 799 P.2d 1163, 1165 (Utah 1990), we held that subsection (4)(g) required the reviewing court to "consider both the evidence that supports the ... factual findings and the evidence that detracts from the findings." We explained that substantial evidence "is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Id.* Thus, UAPA has indeed altered our standard of review regarding factual findings, substituting an intermediate-deference standard for a great-deference standard. Our substantial evidence test now appears analogous to the federal substantial evidence test, which requires the reviewing court to determine if the findings of fact were reasonable and rational. The substantial evidence test does not permit the reviewing court to conduct its own weighing of the evidence, but requires it to determine only whether the fact finder's weighing was reasonable, that is, supported by substantial evidence based on the record as a whole.

### G. Subsection (4)(h)(i)

Subsection (4)(h) contains four parts. Part (i) permits appellate relief for an agency's "abuse of discretion," a term of art denoting a particular standard of review. Abuse of discretion review predates UAPA, and we suggested in *Morton* that section 63–46b–16(4)(h)(i) meant to incorporate precisely this established standard. *See* 814

P.2d at 587–88. This standard, like the substantial evidence standard, is a type of intermediate review and requires the appellate court to affirm agency action if reasonable and rational. *See id.* at 587. *See generally Administrative Services*, 658 P.2d at 610–11. UAPA therefore did not alter pre-UAPA law regarding the standard to be applied in abuse of discretion claims.

UAPA did, however, alter the way in which appellate courts determine the scope of agency action entitled to review as an abuse of discretion. In *Morton*, we explained that intermediate deference was no longer appropriate solely because the agency had expertise or experience regarding the issue. *See* 814 P.2d at 588. Under UAPA, abuse of discretion review properly occurs only under section 63–46b–16(4)(h)(i), or in other words, only when the agency is exercising discretionary power delegated to it by statute. *See id.* at 587–89. But we also explained in *Morton* that this statutory delegation of discretion could occur both explicitly and implicitly. Regarding implicit delegation, we commented:

> [I]n the absence of a discernible legislative intent concerning the specific question in issue, a choice among permissible interpretations of a statute is largely a policy determination. The agency that has been granted authority to administer the statute is the appropriate body to make such a determination. Indeed, both the legislative history to section 63–46b–16 and our prior cases suggest that an appellate court should not substitute its judgment for the agency's judgment concerning the wisdom of the agency's policy. When there is no discernible legislative intent concerning a specific issue the legislature has, in effect, left the issue unresolved. *In such a case, it is appropriate to conclude that the legislature has delegated authority to the agency to decide the issue.*

*Id.* at 589 (emphasis added) (footnotes omitted). Thus, although *Morton* precludes using expertise and experience as the sole basis for granting intermediate deference to an agency, expertise and experience may yet be relevant in determining whether the

legislature implicitly delegated to the agency some discretion regarding a specific issue.

Appellate courts often consider challenges to an agency's interpretation or application of specific laws. As explained earlier, under subsection (4)(d) courts should use a correction of error standard to review these challenges. But if there is no discernible legislative intent as to how a statute should be interpreted or applied, *Morton* suggests that a challenge to the interpretation or application of the statute could constitute a subsection (4)(h)(i) challenge and so receive intermediate review. *Morton* thus directs courts and attorneys to carefully consider whether a particular agency action constitutes a simple interpretation or application of law, reviewed under subsection (4)(d), or merely an exercise of implicitly delegated discretion to interpret or apply the law, reviewed under subsection (4)(h)(i).

### H. Subsections (4)(h)(ii), (iii), and (iv)

Part (ii) of subsection (4)(h) permits relief when an agency action is contrary to the rule of an agency. I note that subsection (4)(e) permits relief when an agency has failed to follow "prescribed procedure." I conclude that subsection (4)(e) applies to procedures applicable to agencies but promulgated elsewhere, while subsection (4)(h)(ii) involves all rules and procedures promulgated by the agency itself. As explained above, under subsection (4)(e) courts should employ a correction of error standard to review claims of an agency's failure to follow externally imposed procedures. However, courts should employ an intermediate standard to review claims of an agency's failure to follow its own rules. Because courts should uphold agency rules if they are reasonable and rational, courts also should uphold reasonable and rational departures from agency rules absent a showing by the party challenging the departure that the departure violated some other right. *Union Pacific R.R. v. Auditing Div.*, 842 P.2d 876, 879 (Utah 1992).

Part (iii) of subsection (4)(h) permits relief for agency action that is "contrary to the agency's prior practice." This provision also demands reasonableness and rationality review, explicitly permitting the inconsistency if the agency can "demonstrate a fair and rational basis" for it. This explicit standard of review apparently shifts the burden of persuasion, however; it requires the agency to demonstrate the reasonableness and rationality of its departure, while in the typical challenge to agency action, the party challenging the action carries the burden of demonstrating its impropriety.

Finally, part (iv) of subsection (4)(h) permits relief for agency action that is "otherwise arbitrary or capricious." Unfortunately, courts have used the phrase "arbitrary or capricious" to describe both intermediate-deference review and great-deference review. *See Administrative Services*, 658 P.2d at 610 (intermediate deference); *id.* at 609 (great deference). But the other parts of subsection (4)(h) guide us in interpreting this catch-all provision, for we must read part (iv) in conjunction with parts (i) through (iii). Moreover, part (iv) begins with the word "otherwise," implying that parts (i), (ii), and (iii) also concern types of arbitrary or capricious agency conduct, thereby reinforcing the position that subsection (4)(h) should be treated as a unified whole. Having concluded previously that all the other parts of section 63–46b–16(4)(h) merit intermediate review, I believe that we should assign the same standard to section 63–46b–16(4)(h)(iv). *See Anderson v. Public Serv. Comm'n*, 839 P.2d 822, 824 (Utah 1992). I therefore conclude that all parts of subsection (4)(h) demand reasonableness and rationality review.

### I. Summary of UAPA Standards of Review

Appellate courts should review an agency's factual findings under a "substantial evidence" test, a form of reasonableness and rationality review. If the findings are not reasonable, courts should then provide relief under section 63–46b–16(4)(g). Courts should also apply an intermediate standard in reviewing other agency exercises of statutorily delegated discretion,

whether in interpreting or applying the law, in departing from the agency's own rules, or in departing from its own practice. If such agency action is not reasonable or rational, courts might then provide relief under the appropriate provision of section 63–46b–16(4)(h). Under all other provisions of section 63–46b–16(4), however, the reviewing court will face questions of law that it is as well suited to decide as is the agency. The court should review these issues under a correction of error standard, granting the agency no deference.

## II. ANALYSIS OF SEMECO'S CLAIMS

### A. *SEMECO's Charitable Status*

The bulk of SEMECO's argument to this court concerns the Tax Commission's treatment of its religious status, but SEMECO also indirectly disputes the Commission's treatment of its charitable status. The Commission concluded that SEMECO did not qualify for a sales tax exemption as a charitable institution because (1) SEMECO's charity "was not generally available to the public as a whole," and (2) the charitable service "was not done without the expectation of gain." SEMECO brings its challenges under three subsections of Utah Code Ann. § 63–46b–16. Under subsection (4)(a), SEMECO claims that the Commission violated the religion clauses of both the United States and Utah Constitutions. Under subsection (4)(d), SEMECO claims that the Commission erroneously interpreted or applied the law. Under subsection (4)(h), SEMECO claims that the Commission abused its discretion or acted in an otherwise arbitrary and capricious manner. I conclude that the Commission abused its discretion in denying SEMECO a tax exemption on these grounds; consequently, we should vacate and remand for further consideration.

### 1. Constitutional Issues

The Tax Commission's order implies that to qualify as charitable, an institution may not derive or expect to derive gain from its charitable services. SEMECO argues that this requirement is "troublesome" to religious organizations and creates free exercise problems. Although I explain below that this requirement is troublesome on nonconstitutional grounds, I find no merit in SEMECO's constitutional argument, which in any event defies analysis. I can only speculate from SEMECO's brief that SEMECO perhaps misunderstood the Commission to view whatever intangible benefit to one's soul an act of charity might produce, whatever personal satisfaction one might receive in return for acting in conformity with one's religious beliefs, or whatever community goodwill might arise out of the service as the "gain" that negated charitable intent. No evidence exists that the Commission had this type of gain in mind. Although SEMECO also seems to claim that other constitutional infirmities infected the Commission's conclusion that SEMECO was not a charitable institution, I can find neither rationale nor evidence for such defects. I therefore reject SEMECO's claim for relief under section 63–46b–16(4)(a).

### 2. Erroneous Interpretations or Applications of Law

As explained in part I.G. above, appellate courts reviewing a subsection (4)(d) challenge should first determine whether the challenge properly belongs under that subsection, receiving no-deference review, or instead should be treated as an abuse of discretion challenge under subsection (4)(h)(i), receiving intermediate-deference review. I conclude that the issues SEMECO raises under subsection (4)(d) actually merit treatment under subsection (4)(h)(i).

SEMECO's subsection (4)(d) challenges involve the Tax Commission's interpretations or applications of Utah's statutory sales tax exemption for "religious or charitable institutions." Utah Code Ann. § 59–12–104(8). The statute does not define either "religious institution" or "charitable institution." It does not include any standards to guide the Commission in determining whether an institution qualifies as either religious or charitable, nor does it contain other clear signs for divining legislative intent concerning the meaning of these operative terms. Furthermore, I

have found no legislative history to aid interpretation.

In *Morton*, we stated that "when the operative terms of a statute are broad and generalized, these terms 'bespeak a legislative intent to delegate their interpretation to the responsible agency.'" 814 P.2d at 588 (quoting *Administrative Services*, 658 P.2d at 610). We also stated, "When there is no discernible legislative intent concerning a specific issue ..., it is appropriate to conclude that the legislature has delegated authority to the agency to decide the issue." *Id.* at 589. Section 59–12–104(8) is a classic example of a statute with broad and generalized operative terms for which no specific legislative intent can be discovered. Accordingly, I conclude that the legislature implicitly delegated to the Commission the discretion to interpret the terms "religious institution" and "charitable institution." As a result, subsection (4)(h)(i), not subsection (4)(d), governs this review, and we will reverse the Commission only if it abused its discretion in interpreting and applying these terms.

### 3. Abuse of Discretion

As noted in part I.G. of this opinion, UAPA requires appellate courts to employ a reasonableness standard in determining whether an agency has abused its discretion under subsection (4)(h). *See Morton*, 814 P.2d at 587. Unfortunately, because the briefing and argument in this review confused the charitable status issue with the religious status issue, and also because both parties focused their arguments on the constitutional and statutory challenges brought under subsections (4)(a) and (4)(d) rather than on a subsection (4)(h) challenge, neither party has adequately framed the specific issue of the reasonableness of the Tax Commission's articulated grounds for denying SEMECO a charitable exemption. Nevertheless, portions of the arguments and the record reveal problems with the

Commission's current interpretation and application of the term "charitable institution."

The Commission's interpretive guidelines for defining "religious or charitable institution" appear on the reverse side of its tax exemption application form.[2] As applied to evaluating an institution's charitable status, the listed guidelines all seem reasonable. They require, for example, that the organization be incorporated as a nonprofit corporation, that it be organized primarily for certain charitable or religious purposes, that it have an IRS section 501 or section 509 federal income tax exemption, that at least one-third of its operating funds come from donations, and that its "[s]ervices and benefits ... be available to a large segment of the community." My review of the record suggests that none of these listed guidelines render SEMECO ineligible for a charitable exemption from Utah sales tax.

The guidelines explicitly state, however, that they are not all-inclusive, and in fact the listed guidelines do not include the two implied Commission standards that SEMECO did not meet: (1) that the institution must provide the charity without the expectation of gain, and (2) that the institution must make the charity available to the public as a whole.[3] Although I hesitate to conclude today that the two additional Commission standards are inherently unreasonable, I nonetheless question their reasonableness as presently defended by the Commission.

The Commission apparently adopted these additional standards in reliance on *Utah County v. Intermountain Health Care*, 709 P.2d 265 (Utah 1985) (*Intermountain Health Care* or *IHC*). But the Commission's reliance on *Intermountain Health Care* is misplaced, for that case dealt with exemption from *property* tax rather than sales tax. In addition, the Commission has misinterpreted *IHC*. Un-

---

**2.** Like the sales tax exemption statute itself, the one Utah Administrative Code regulation regarding the exemption for religious or charitable institutions does not define these terms. *See* Utah Admin.Code R865–19–43S.

**3.** The Commission apparently interprets this last standard to require something more than its listed guideline that the "services and benefits" of the charity "be available to a large section of the community."

less the Commission has other justifications for its additional standards, those standards may indeed be unreasonable.

In *Intermountain Health Care,* Utah County sought review of a Tax Commission ruling exempting Utah Valley Hospital and American Fork Hospital from property tax under statute and under article XIII, section 2 of the Utah Constitution. We noted that the property tax exemption is only available for property used " '*exclusively* for ... charitable purposes.' " 709 P.2d at 269 (emphasis added) (quoting Utah Const. art. XIII, § 2).[4] We then set forth six factors to be considered in determining whether property is being used exclusively for charitable purposes. Among them are

whether the stated purpose of the entity is to provide a significant service to others without immediate expectation of material reward; ... whether the recipients of the "charity" are required to pay for the assistance received, in whole or in part; ... [and] whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the restriction bears a reasonable relationship to the entity's charitable objectives.... We emphasize that ... the foregoing factors are not all of equal significance, nor must an institution always qualify under all six before it will be eligible for an exemption.

*Id.* at 269–70. We concluded that the hospitals at issue did not qualify for a tax exemption, primarily because the "essential element of gift to the community" was lacking. *Id.* at 278.

The Commission certainly may choose to use our property tax exemption principles as a guide for granting sales tax exemptions. But the two exemption provisions differ significantly, and the Commission should base any decision to derive guidance from our property tax principles on its own independent efforts to interpret the sales tax exemption statute. The charitable property tax exemption appears in the Utah Constitution, art. XIII, § 2(2)(c), obligating this court to interpret it, while the charitable sales tax exemption appears in a statute that implicitly delegates to the Commission the discretion to adopt reasonable interpretive standards. *See* Utah Code Ann. § 59–12–104(8). The Commission is bound to follow our interpretation of the property tax exemption clause, but it has the discretion to adopt any reasonable interpretation of the sales tax exemption statute.[5]

Furthermore, differences exist in the operative language of these two exemptions. When independently interpreted, the scope of the exemptions might be expected to differ as well. The property tax provision is narrower; it applies only to property "used exclusively for ... charitable ... purposes," Utah Const. art. XIII, § 2(2)(c), while the sales tax provision initially makes the exemption broadly available to all "charitable institutions" and only then narrows its scope by limiting it to those sales and purchases made "in the conduct of their regular ... charitable functions or activities." Utah Code Ann. § 59–12–104(8). Thus, "charitable institution" in the sales tax exemption statute may accommodate a broader interpretation than the one we have given to "used exclusively for ... charitable purpose" in property tax cases. Under the Commission's printed guidelines, an entity may qualify for a sales tax exemption as a charitable institution if it is organized "primarily" for charitable purposes; however, its *property* is not exempt from tax under the constitution unless it is used "exclusively" for charitable purposes. It appears that the Commission failed to consider this difference in deciding to use our property tax exemption principles in the sales tax context.

Having apparently regarded itself bound to follow our property tax exemption doctrine, the Commission aggravated that error by misconstruing that doctrine. As

---

4.  Article XIII, section 2 was amended and reorganized effective January 1, 1983. The property tax exemption language quoted above did not change; it was recodified at section 2(2)(c). *Intermountain Health Care* quoted the old version.

5.  Of course, if this court determines that a certain interpretation of the sales tax statute is unreasonable, the Commission is bound by that ruling.

noted above, the Commission relies on *Intermountain Health Care* to justify its strict sales tax exemption requirements that SEMECO make its charity available to the public as a whole and that SEMECO provide its charity without expectation of gain. But an organization is not required to meet these conditions to qualify for a property tax exemption, as *Yorgason v. County Board of Equalization*, 714 P.2d 653 (Utah 1986), makes clear.

In *Yorgason*, we reviewed the factors set forth in *Intermountain Health Care*. We reiterated the baseline principles that "[t]he test of charitable purpose is public benefit or contribution to the common good or public welfare. It is also necessary that there be an element of gift to the community." *Yorgason*, 714 P.2d at 657 (footnotes omitted); *see IHC*, 709 P.2d at 269. We then went on to clarify that the benefit to the community could come by lessening a burden the community would otherwise bear, even if only a "restricted" group in the community would have direct access to the charitable service itself. *See* 714 P.2d at 658 n. 20, 660. We also explained, "An organization or institution may still qualify for a tax exemption even if some charges are made to the recipients ... to help cover operating expenses, as long as these charges are not commensurate with the benefits provided." *Id.* at 660.

Thus, to the extent that the Commission requires an institution to provide its services free of charge or to make them available to every person in the community to qualify for a sales tax exemption, it has misinterpreted *Intermountain Health Care* and *Yorgason*. The Commission has therefore defined "charitable institution" more strictly in sales tax cases than this court interprets "used exclusively for charitable purposes" in property tax cases.

I further note that the Commission appears to have ignored this court's previous interpretation of the term "charitable institution" in the sales tax exemption statute. Over sixteen years ago, this court held that

under the predecessor of Utah Code Ann. § 59–12–104(8), a nonprofit organization could obtain a charitable sales tax exemption for its sales of tennis tournament admission tickets even though these sales generated net income for the organization. *See Youth Tennis Found. v. Tax Comm'n*, 554 P.2d 220 (Utah 1976). We concluded that neither this gain nor the fact that the organization also derived revenue from sales of tennis equipment to local schools changed the organization's fundamental character as a charitable institution whose purpose was to contribute to the public welfare. *Id.* at 222–23. Although the Commission today has the discretion to depart from this previous interpretation, it must have reasonable grounds for doing so.

I believe the "charitable purpose" standards from our property tax exemption cases reinforce our earlier pronouncements in *Youth Tennis* regarding the "charitable institution" sales tax exemption. I also believe it likely that had the Commission properly applied these property tax principles, SEMECO would have qualified for a charitable exemption. The record reflects that to the extent that SEMECO derived gains through its charitable activities, these gains did not cover the costs of SEMECO's full complement of activities and were not commensurate with the benefits SEMECO provided directly to the recipients and indirectly to the entire La Verkin area. These gains therefore would not have disqualified SEMECO from an exemption under our property tax standards. *See Yorgason*, 714 P.2d at 660.

Further, the Commission's finding that SEMECO's charity "was not generally available to the public as a whole and appeared to be limited to those individuals who are members of their organization" would not provide a sufficient basis to deny charitable status under this court's property tax principles.[6] *Yorgason* suggests that we should ask whether the charity results in a benefit or service to the larger commu-

---

6. I also question the legitimacy of this finding. Although the record does reflect that the direct beneficiaries of SEMECO's services were usually

SEMECO members, the record also demonstrates without refutation that SEMECO opened most of its activities to the public.

nity, regardless of who participates directly. *See id.* at 657–60. I believe the requirement listed on the Commission's application form that the "[s]ervices and benefits must be available to a large segment of the community" represents this same inquiry, but the additional requirement imposed on SEMECO does not. In making this inquiry, the Commission and its auditors certainly could examine the class of immediate beneficiaries in order to determine whether the benefit to them extends in a meaningful way to the community as a whole. If the institution restricts the class of immediate beneficiaries, then the Commission also could inquire "whether the restriction bears a reasonable relationship to the entity's charitable objectives." *Intermountain Health Care,* 709 P.2d at 269. But even in the property tax context, our decisions preclude a per se rule that denies a charitable exemption whenever the charitable group restricts its beneficiary class.

I fear that the Commission has inadvertently followed this court's property tax exemption principles in considering a sales tax exemption, ignoring relevant sales tax exemption precedent in the process, and then has compounded the error by misconstruing these principles. This action would fail a reasonableness test. The Commission may employ whatever standards it chooses in defining "charitable institution" in the sales tax context, but it must be able to defend its standards as reasonable in their own right. Consequently, I would vacate the Commission's ruling and remand for further consideration.

### B. *SEMECO's Religious Status*

The Tax Commission concluded that SEMECO did not qualify as a religious institution for purposes of sales tax exemption because

> [SEMECO] is not a recognized ministry of the Seventh Day Adventist Church, nor any other organized religious institution....
>
> ....
>
> ... [A]side from the common membership, [SEMECO] has no affiliation with the local Seventh Day Adventist Ministry. Nor is the fact that [SEMECO] conducts weekly prayer meetings and services for its membership sufficient to convert [SEMECO] from a business organization into a religious institution for purpose of the Sales Tax Act.

SEMECO again asks us to review the Commission's conclusion under subsections (4)(a), (4)(d), and (4)(h) of Utah Code Ann. § 63–46b–16. I first look briefly at SEMECO's claim under (4)(d) that the Commission erroneously interpreted or applied the law. Next, I analyze the claim under (4)(h) that the Commission abused its discretion in finding that SEMECO was not a religious institution. Finally, I consider SEMECO's claim under (4)(a) that the Commission violated the state and federal constitutions. I conclude that the Commission both abused its discretion and violated the federal constitution in denying SEMECO a tax exemption as a religious institution. Therefore, I would vacate this finding as well.

### 1. Erroneous Interpretation or Application of Law

SEMECO claims that the Tax Commission erroneously interpreted or applied the law in finding that SEMECO was not a religious institution under section 59–12–104(8). In section II.A.2. above, I concluded that the Commission has the discretion to interpret the term "charitable institution." I now conclude that the Commission has the discretion to interpret "religious institution" as well. The statutes do not define "religious institution," and there is no legislative history to aid interpretation. Accordingly, for the reasons discussed in section II.A.2. above, I do not review SEMECO's claim under subsection (4)(d); rather, I review the claim under (4)(h)(i) for abuse of discretion.

### 2. Abuse of Discretion

As I have explained, no definition of the term "religious institution" exists in either the statutes or the regulations. On the back of its exemption application form, however, the Tax Commission has published a noninclusive list of its own guidelines

for religious and charitable exemptions, the pertinent requirements of which I have described above in part II.A.3. I have stated that these guidelines seem reasonable for determining whether an institution qualifies as charitable; these guidelines also seem helpful in determining whether to grant an institution a religious exemption. Once again, however, the Commission based its denial of SEMECO's request on standards other than those listed. Under the abuse of discretion standard, the court therefore should examine the reasonableness of these additional standards to determine whether the Commission abused its discretion in denying SEMECO an exemption as a religious institution. *See Morton*, 814 P.2d at 587.

Although courts and agencies generally should construe tax exemptions against the taxpayer and require the taxpayer to prove that it qualifies for an exemption, those empowered to construe tax exemption statutes must nevertheless interpret and apply them so as to further their legislative purpose. *See Parson Asphalt Prods., Inc. v. State Tax Comm'n*, 617 P.2d 397, 398 (Utah 1980). Furthermore, because of the peculiar safeguards afforded religious belief and practice in this country, " '[s]trict or narrow construction of a statutory exemption for religious organizations is not favored.' " *Larson v. Valente*, 456 U.S. 228, 243, 102 S.Ct. 1673, 1682, 72 L.Ed.2d 33 (1982) (quoting *Valente v. Larson*, 637 F.2d 562, 570 (8th Cir.1981)). "To construe exemptions so strictly that unorthodox or minority forms of worship would be denied the exemption benefits granted to those conforming to the majority beliefs might well raise constitutional issues." *Washington Ethical Society v. District of Columbia*, 249 F.2d 127, 129 (D.C.Cir.1957). Therefore, although the Commission may adopt demanding standards for construing Utah's statutory sales tax exemption for religious institutions, those standards must

respect the legislature's conscious choice to extend this tax benefit to all "religious" institutions. Commission standards should be sensitive to the potential constitutional issues and provide any bona fide religious institution an opportunity to demonstrate its entitlement to the exemption.

The Commission argues that the proper way to determine whether an organization is a religious institution is "to use the fourteen factors used by the IRS." The Commission further argues that SEMECO fails to meet this standard. But the fourteen factors to which the Commission refers represent criteria the IRS has developed to determine whether, under 26 U.S.C. § 6033 (1988), an organization is a "church." *See* Jerome Kurtz [IRS Commissioner], *Difficult Definitional Problems in Tax Administration: Religion and Race*, 23 Cath. Law. 301, 304 (1978), *reprinted from* [1978] 9 Fed. Taxes (P–H) ¶ 54,820; *Lutheran Social Servs. of Minnesota v. United States*, 758 F.2d 1283, 1286–87 (8th Cir. 1985). Use of the fourteen factors would be inappropriate because under the federal scheme, whether an institution is a "church" is a different question than whether an institution is a tax-exempt "religious organization."[7]

The Commission admits that "church" has a more limited meaning than "religious organization" in the Internal Revenue Code, but the Commission vastly understates this difference and completely fails to explain or acknowledge the relevant statutory context: Section 6033(a)(1) requires "every organization exempt from taxation under section 501(a)" to file an annual return with the IRS, and the subsequent paragraph exempts "churches" from this filing requirement. *See* 26 U.S.C. § 6033(a)(1), (2)(A)(i). Thus, an entity's status as a church only affects whether that entity is subject to the filing requirements of section 6033; it has nothing to do with

---

7. I also note that there may be constitutional problems with the factors themselves. For example, the factors include whether the organization has a "definite and distinct ecclesiastical government" and whether the organization has "Sunday schools for religious instruction of the young." *See, e.g., Lutheran Social Servs.*, 758

F.2d at 1286–87. Many organizations which are indisputably "churches" do not share these characteristics. *See* Bruce J. Casino, Note, *"I Know It When I See It": Mail–Order Ministry Tax Fraud and the Problem of a Constitutionally Acceptable Definition of Religion*, 25 Am.Crim. L.Rev. 113, 139–46 (1987).

whether the entity is exempt from income tax under section 501.

Under this scheme, therefore, the IRS often faces the problem of "determining whether an admittedly religious organization is also a church." *See* Kurtz at 303. This problem, however, will rarely arise unless the organization has already received a tax exemption under 26 U.S.C. § 501(a), the provision exempting religious organizations from income tax. Accordingly, with one exception all the cases the Commission cites in support of its use of the fourteen points involve organizations that, while not qualifying for the filing exemption as a church, nevertheless had already received federal income tax exemptions as religious organizations. *See Lutheran Social Servs.*, 758 F.2d 1283; *American Guidance Found., Inc. v. United States*, 490 F.Supp. 304 (D.D.C.1980); *De La Salle Inst. v. United States*, 195 F.Supp. 891 (N.D.Cal.1961); *The Church of the Visible Intelligence That Governs the Universe v. United States*, 4 Cl.Ct. 55 (1983); *Chapman v. Commissioner*, 48 T.C. 358 (1967). In the one exception, although the court determined that the organization in question was neither a church nor a religious organization, it applied different criteria to each determination. *See United States v. Jeffries*, 854 F.2d 254 (7th Cir.1988). Thus, it would be unreasonable for the Commission to rely on the fourteen factors simply by analogy without an independent determination that these factors are helpful in deciding whether an entity qualifies as a tax-exempt religious institution.

I also note the irony of the Commission's suggesting that this court apply IRS standards, while the Commission itself fails to accord probative weight to the IRS's own evaluation of SEMECO. On December 19, 1988, the IRS wrote SEMECO: "[W]e have determined you are exempt from Federal income tax under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3)." The Commission certainly had no obligation to accord any weight to this determination (other than to find that SEMECO thereby had satisfied one of the Commission's own exemption application form guidelines), yet the Commission suggests to this court that in the absence of our own standards for evaluating religious tax exemption status, we should emulate the federal approach.

In fairness to the Commission, I acknowledge that it did attempt to justify its refusal to accord more weight to SEMECO's section 501(c)(3) exemption. The Commission argued that the IRS ruling "is conditional and temporary and is not a final determination by the IRS." I read the IRS letter differently, however. It indicates that the IRS has determined that SEMECO meets the qualifications for both section 501(c)(3) exempt organization status and section 509 public foundation status. It then limits SEMECO's section 509 status to a temporary "advance ruling" period of approximately five years, at the end of which the IRS will review SEMECO's financial records. But this temporary portion of the IRS approval pertains solely to SEMECO's section 509 status, not to SEMECO's qualification for a religious tax exemption under section 501(c)(3).[8]

I do not find it necessary at this time to set forth a specific "test" for the Commission to follow in determining whether an entity is a religious institution. The Commission has the discretion to use any reasonable standards to make this determination. In this case, the Commission denied

---

**8.** Inaccurate representations by Commission counsel at the hearing may explain the Commission's erroneous reading of the IRS ruling. Counsel first described the section 501 exemption as an "advance ruling" and as "a temporary exemption status." Counsel also discounted the IRS letter as "not based on the fourteen points that the IRS has used in litigation to decide whether the organization is a religious organization," and counsel claimed that "if the IRS decides to go back on its initial letter, [it] uses those points to determine whether an organization is a religious institution." Counsel's argument suggested both that the temporary portion of the IRS ruling pertained to SEMECO's section 501(c)(3) tax exemption and that at the end of the advance ruling period, the IRS would use the fourteen points to evaluate SEMECO's religious institution status. I believe that counsel erred in both representations. Unfortunately, SEMECO was not represented by counsel and did not challenge these errors.

SEMECO's application for a tax exemption because (1) SEMECO is not a "recognized ministry" of the Seventh-day Adventist Church or any other organized religion, (2) SEMECO has no official affiliation with the local Seventh-day Adventist ministry, and (3) its weekly prayer meetings and services were not sufficient to make SEMECO a religious organization in its own right. I find that the denial of SEMECO's application on these grounds was unreasonable and was therefore an abuse of discretion.

SEMECO claimed its religious exemption as an independent ministry of the Seventh-day Adventist Church. SEMECO perceived itself as severed from the local La Verkin church (and from the Nevada–Utah Conference, the regional governing body), but still as part of the world Seventh-day Adventist community. As evidence that the Seventh-day Adventist faith permits independent ministries, SEMECO introduced a set of guidelines for "acceptable independent ministries" promulgated by the North American Division of the Seventh-day Adventist Church. SEMECO explained that it believed it satisfied these guidelines. SEMECO also attempted to demonstrate its religious nature by describing its regular worship activities, summarizing some of the Seventh-day Adventist tenets it inculcated in its membership, and explaining its organizational structure. The Commission was not persuaded by these arguments, however, and denied the application.

In evaluating SEMECO's information, the Commission simply considered the wrong question. Rather than determining whether SEMECO showed itself to be a bona fide religious institution in itself, the Commission chose instead to determine whether these showings demonstrated that SEMECO in fact was a bona fide Seventh-day Adventist organization. The Commission reviewed the independent ministry guidelines and then decided that because SEMECO had not qualified as a Seventh-day Adventist independent ministry and lacked any formal affiliation with or approval from other organized bodies of the Seventh-day Adventist Church, it was not a religious institution.

But SEMECO's lack of approval or recognition as a religious ministry of the Seventh-day Adventist world church, or of any other organized religion, is irrelevant to whether SEMECO is a religious institution in its own right. The Commission may inquire only whether a putative religious institution is inherently religious, not whether it is affiliated with another recognized religious institution. Of course, the existence of an affiliation with another religious body may aid the Commission in answering this question, but the lack of such affiliation should not be dispositive. The Commission, therefore, had no reasonable basis for denying SEMECO's religious exemption.

Although by submitting evidence of its nature as an independent ministry of Seventh-day Adventists SEMECO naively encouraged the Commission to ask the wrong question, SEMECO was only attempting to support its good faith claim to be religious. The Commission attempts to justify its questioning as merely an inquiry into whether SEMECO had misrepresented itself, but to the extent that the Commission doubted the veracity of SEMECO's independent ministry claim, the Commission misunderstood it. SEMECO has never claimed to be a *recognized* body of the Seventh-day Adventist world church; it merely has explained, without contradiction, that the world church permits Seventh-day Adventists to form independent ministries as unaffiliated, unrecognized bodies of the general church. SEMECO claims to be one such independent ministry, seeking in good faith to promote Seventh-day Adventism.

SEMECO also explained, however, that it had applied for membership as a "church industry" in Adventist Service Industries, a department of the General Conference of the Seventh-day Adventist world church, and that as of the hearing, the General Conference had not yet recognized SEMECO as a church industry. The Commission may have confused SEMECO's independent *ministry* claim with its lack of Seventh-day Adventist church *industry* status. But SEMECO never suggested that its inherent religious status depended upon formal rec-

ognition as either a ministry or an industry by the Seventh-day Adventist world church. It was inappropriate for the Commission to conclude that SEMECO is not a religious institution because it conducts its religious activities "without the approval or direction of" a recognized Seventh-day Adventist organization.

Nor did the Commission act reasonably in concluding, "Nor is the fact that [SEMECO] conducts weekly prayer meetings and services for its membership sufficient to convert [SEMECO] from a business organization into a religious organization." I do not understand this cavalier dismissal of SEMECO's twice-weekly prayer meetings and services, particularly in light of SEMECO's demonstration of its nonprofit corporation status, its religious and charitable purposes, and its satisfaction of other criteria stated on the Commission's exemption application form. The Commission attempts to support this conclusion by explaining that SEMECO only held these services "for the convenience of some ... who were unable to attend the regular services at the Laverkin [sic] Seventh Day Adventist Church" and that the La Verkin church had not approved SEMECO's worship services. The Commission thus seems to imply that when an institution that conducts nonworship activities seeks a religious sales tax exemption, it must also conduct regular worship activities either as an integrated part of a recognized religion or on behalf of participants having no other religious affiliation. This standard simply has no place in evaluating an institution's religious status, for it would imply that individuals may not in good faith belong to several independent religious sects or express their religiousness as communicants in more than one belief system.

In sum, both the hearing transcript and the Commission order suggest that the determinative reason the Commission denied SEMECO's religious exemption was SEMECO's lack of formal Seventh-day Adventist recognition or approval. This Commission action constituted an abuse of discretion.

## 3. Unconstitutional Agency Action

By focusing its inquiry into SEMECO's religious status on SEMECO's relationship with the Seventh-day Adventist Church, the Tax Commission also intruded on sensitive constitutional territory. SEMECO argues that the Commission violated the establishment clauses of the United States and Utah Constitutions, the free exercise clauses of both constitutions, and the "no union of Church and State" clause of the Utah Constitution. SEMECO also makes various due process and equal protection claims, but I find no separate merit in these claims not equally cognizable under the religion clauses and restrict my analysis accordingly. *See Gillette v. United States*, 401 U.S. 437, 449 n. 14, 91 S.Ct. 828, 836 n. 14, 28 L.Ed.2d 168 (1971). As explained in part I.C., this court should conduct a correction of error review of these constitutional issues. I review SEMECO's specific claims only after discussing the difficult task facing both this court and the Commission in attempting to formulate a sound approach to the exercise of governmental power in this sensitive area.

(a) *The Challenge of Administering Religious Tax Exemptions*

I am not aware of any prior occasions when this court has addressed the problem of constitutionally distinguishing between those institutions with a legitimate claim to be religious and those with no such legitimate claim. Because of the constitutional ramifications, many courts and legislatures, including Congress, have avoided defining "religion." *See* Terry L. Slye, *Rendering Unto Caesar: Defining "Religion" for Purposes of Administering Religion–Based Tax Exemptions*, 6 Harv.J.L. & Pub.Pol'y 219, 278–79 (1983). In fact, "[m]any serious scholars have urged that any attempt by the government to define religion should be resisted as an unconstitutional infringement of the rightful autonomy of religious bodies." Edward M. Gaffney, Jr., *Governmental Definition of Religion: The Rise and Fall of the IRS Regulations on an "Integrated Auxiliary of a Church*," 25 Val.U.L.Rev. 203, 242 (1991). Yet absent some means of evaluating reli-

gious status, the religion clauses "could become a limitless excuse for people to avoid all unwanted legal obligations." Laurence H. Tribe, *American Constitutional Law* 1244 (2d ed. 1988). In particular, when the government has conditioned a government benefit, such as a tax exemption, on an entity's religious status, then inevitably some government decision maker must decide whether to treat the entity as religious.

Typically, therefore, these decision makers have evaluated individual entities on a case-by-case basis without the assistance of any definitional guidelines. During the early decades of this country's history, they may have followed "a nearly universal perception on the part of the citizenry as to what constituted a 'religion.'" *See* Slye at 224. Today, however, "the scope of religious pluralism in the United States alone has resulted in such a multiplicity and diversity of ideas about what is a 'religion' or a 'religious belief' that no simple formula seems able to accommodate them all." Jesse H. Choper, *Defining "Religion" in the First Amendment,* 1982 U.Ill.L.Rev. 579, 579. In this context, all but the most prudent and circumscribed adjudications of religious status inevitably will implicate constitutional issues.

To minimize this difficulty, American courts strive to avoid examining the content of a putative religious belief and instead focus on the sincerity of the claim. *See, e.g., Thomas v. Review Board,* 450 U.S. 707, 713–16, 101 S.Ct. 1425, 1429–31, 67 L.Ed.2d 624 (1981); *United States v. Ballard,* 322 U.S. 78, 85–88, 64 S.Ct. 882, 885–87, 88 L.Ed. 1148 (1944). The IRS, too, focuses on sincerity in evaluating religious tax exemption claims under 26 U.S.C. § 501(c)(3) (1988 & Supp. II 1990), which exempts religious organizations from federal income tax. Although neither statute nor regulation defines "religious" under federal law, the regulations, coupled with IRS policy statements and practice, suggest four principal requirements an organization must meet to receive a religious exemption: The religious beliefs of the organization must be sincerely held; the organization must be organized exclusively

for its religious (or other exempt) purposes; it must be operated exclusively for these purposes; and its activities must not be contrary to public policy. Slye at 254; *see* 26 C.F.R. § 1.501(c)(3)–1(a)(1) (1991); Kurtz at 302–03.

Furthermore, the IRS will deny a religious exemption on the ground of insincerity only when presented with "a clear showing that the beliefs or doctrines ... are not sincerely held." Kurtz at 303. Even when the IRS believes that an organization should not qualify for a tax exemption, it tries to avoid challenging the religious nature of the, entity. The IRS prefers to challenge the organization for failure to meet certain nonreligious criteria instead. Slye at 288. These nonreligious criteria pertain to whether the organization satisfies the regulatory requirements that it be "organized and operated exclusively for one or more [exempt] purposes," 26 C.F.R. § 1.501(c)(3)–1(a)(1). They include requirements that the organization serve a public rather than a private purpose, *id.* § 1.501(c)(3)–1(d)(1)(ii); avoid any private inurement of funds, *id.* §§ 1.501(c)(3)–1(b)(4), –1(c)(2); and shun involvement in political activities, *id.* at §§ 1.501(c)(3)–1(b)(3), –1(c)(3).

I discuss the IRS approach because it provides the Tax Commission with an example of how to carry out its constitutionally sensitive duties. The most important requirement on the Commission's application form is that the applicant be organized for the "advancement of religion." This broad requirement can be interpreted and applied in a number of ways. I recommend that the Commission follow the IRS example and look primarily at the sincerity rather than the content of an applicant's purported beliefs. I do not foresee any constitutional problems with such an inquiry in the abstract, though its practical implementation may be difficult. The Commission may therefore wish to adopt some nonreligious tests similar to those used by the IRS, such as the requirement that a religious organization may not devote a substantial part of its activities or resources to political activity. In this way, the Commis-

sion may be able to follow the IRS in not questioning an applicant's sincerity unless it is clearly lacking.[9]

The constitutionality of the general requirement that an entity be organized for the "advancement of religion" is not at issue, however. Instead, the issue here is the constitutionality of the Commission's focus on SEMECO's relationship to the Seventh-day Adventist Church organization in determining whether SEMECO is entitled to a tax exemption. I now review SEMECO's specific constitutional challenges to the Commission's denial of its application.

(b) *SEMECO's Establishment Clause Claims*

SEMECO brings its establishment clause claims under both the United States Constitution and the Utah Constitution. We have stated elsewhere that "we will not engage in state constitutional analysis unless an argument for different analyses ... is briefed." *State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988). Since SEMECO has not briefed any independent grounds for interpreting the Utah clause, I review the establishment claim only as a federal issue, applying the appropriate federal constitutional standards. Under these standards, government action must meet three criteria to avoid violating the establishment clause: The action must have a secular purpose; its primary effect must neither inhibit nor advance religion; and it must not foster an excessive government entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). SEMECO attacks the Tax Commission action primarily on the ground of excessive government entanglement.

SEMECO bases its entanglement argument in part on the Commission's consideration of an affidavit from the president of the Nevada–Utah Conference of the Seventh-day Adventist Church. The affidavit stated, "[SEMECO] is not controlled nor supervised ... by the Seventh-day Adventist Church." Commission counsel urged the Commission to "look at [the] affidavit very carefully and give it great weight," and the Commission's findings of fact indicate that the Commission did rely on the affidavit. SEMECO contends that the Commission thereby permitted another religious organization to define Seventh-day Adventist orthodoxy for the Commission and that the Commission "promoted and established the doctrinal and religious determinations of ... one religion" at the expense of another religious body. I agree.

Denominational or intrafaith squabbles have no place in a government assessment of entitlement to a religious preference. As the United States Supreme Court said in a recent analysis of the "entanglement" problem, "When the state becomes enmeshed with a given denomination in matters of religious significance, the freedom of religious belief of those who are not adherents of that denomination suffers, even when the governmental purpose underlying the involvement is largely secular." *Aguilar v. Felton*, 473 U.S. 402, 409–10, 105 S.Ct. 3232, 3236, 87 L.Ed.2d 290 (1985). In SEMECO's case, the Commission relied on another organization's representation that SEMECO was not a Seventh-day Adventist denomination. If SEMECO had claimed to be the recognized Seventh-day Adventist group in La Verkin, then the affidavit might have had relevance in assessing the validity of this claim, but from the outset SEMECO has described itself only as an independent group, striving of its own accord to advance its belief in Seventh-day Adventist principles. In this context, the Commission committed constitu-

9. The Commission's application form also indicates that an entity's "[s]ervices and benefits must be available to a large segment of the community" to qualify for a tax exemption. The Commission would create serious constitutional difficulties if it required a sect to have a certain number of members or adherents to be a religious institution. This requirement is probably intended to apply only to purported *charitable* organizations rather than to religious ones. In any event, a sincere religious purpose in itself should benefit the community at large. The benefit to the community comes simply from the expression of a diversity of belief and the cultivation of a constitutional freedom.

tional error by permitting the Nevada–Utah Conference to discredit SEMECO's independent religious status.

More significant than the Commission's reliance on the affidavit is its conclusion that SEMECO did not qualify for a religious tax exemption because it did not meet the independent ministry guidelines set out by the North American Division of Seventh-day Adventists. Although the Commission's order does not definitively indicate that the Commission based its denial on this conclusion, both at oral argument and in its brief to this court, the Commission explicitly supported its denial on precisely this ground. SEMECO claims that the Commission violated the establishment clause by taking it upon itself to interpret these independent ministry guidelines: "This conduct entangled the State of Utah in religious administration and ... doctrinal disagreements of those professing affiliation with one religion." Again I agree.

The Commission argues that its questions to SEMECO about its organization and doctrine concerned solely whether SEMECO was in fact a religious institution, but I have already concluded above that the Commission focused principally on whether SEMECO qualified as an independent ministry of the Seventh-day Adventist Church. When the Commission becomes the arbiter of orthodoxy or the enforcer of a particular creed's internal doctrinal standards, it has become excessively entangled with religion.

In defense of both its use of the affidavit and its inquiry into SEMECO's satisfaction of the independent ministry guidelines, the Commission repeatedly relies on *Young Life v. Division of Employment & Training*, 650 P.2d 515 (Colo.1982). Among other things, *Young Life* stands for the proposition that an inquiry into an institution's "doctrinal creeds, religious beliefs and practices, time, place and manner of worship services, sacraments administered, religious organizational affiliations, terminology, and sources of financial support" does not inherently create an entanglement problem. *Id.* at 523. But *Young Life* does not stand for the proposition that in assess-

ing one institution's religiousness, the government may rely upon another religious entity's negative assessment or that the government may conduct its own application of a particular religion's doctrinal guidelines. The Commission's actions in SEMECO's case went well beyond those condoned in *Young Life*.

(c) *SEMECO's Free Exercise Claims*

As with its establishment clause claims, SEMECO brings its free exercise clause claims under both the United States Constitution and the Utah Constitution. Again, SEMECO has analyzed its claims only in terms of the federal standards. Therefore, I also treat the free exercise issue solely as a federal claim. Under the pertinent federal standards, "[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989). Applying this standard, SEMECO's free exercise challenge fails. Although SEMECO claims that the Tax Commission has "impede[d] the ability of SEMECO and its members to express and exercise their religious beliefs," SEMECO fails to establish the substantial burden necessary for a free exercise violation. Denial of a tax exemption in itself will rarely impose a substantial burden on religious exercise. *Cf. id.* (suggesting that tax obligations could create substantial free exercise burden to religion whose faith prohibited payment of taxes, but otherwise tax obligations do not create substantial burden).

(d) *SEMECO's "No Union of Church and State" Claim*

In its reply brief, SEMECO makes one independent state constitutional argument. Although styled as a claim under the Utah Constitution's "No union of Church and State" provision, in fact SEMECO's argument concerns two distinct clauses of the Utah Constitution: the requirement that "[t]here shall be no union of Church and State" and the ensuing requirement, "nor shall any church dominate the State or

interfere with its functions." Utah Const. art. I, § 4. SEMECO argues that by according weight to the affidavit of the president of the Nevada–Utah Conference, the Tax Commission violated both of these provisions. This argument also fails, for I am not prepared to conclude that the facts of this case constitute the sort of interference, domination, or union contemplated in our state constitution. This court has not benefited from a full exploration of this claim by both parties, and in this case, other constitutional provisions would suffice to protect the interests of both SEMECO and the people of Utah.

### III. CONCLUSION

I conclude that the Utah State Tax Commission, by determining that SEMECO is not a religious institution entitled to exemption from Utah sales tax under Utah Code Ann. § 59–12–104(8), both abused its discretion and violated the establishment clause of the United States Constitution. SEMECO's resulting failure to receive a sales tax exemption constitutes the substantial prejudice Utah Code Ann. § 63–46b–16(4) requires to provide relief under any of its provisions. Accordingly, pursuant to Utah Code Ann. §§ 63–46b–16(4)(a) and 63–46b–14(4)(h)(i), I would vacate the Commission's order and remand the matter to the Commission. I would also direct the Commission to review the charitable institution standards it employed against SEMECO and either justify these standards on reasonable grounds or abandon them. Consequently, I would hold that the Commission should reconsider both SEMECO's religious status and its charitable status.

I therefore decline to join the majority's affirmance.